******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ANTWAN SEASE
(AC 35554)

Gruendel, Lavine and Pellegrino, Js.

*Argued December 10, 2013—officially released January 28, 2014*

(Appeal from Superior Court, judicial district of
Hartford, Dewey, J.)

*Christopher Y. Duby*, assigned counsel, for the appellant (defendant).

*Sarah Hanna*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David Zagaja*, assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Antwan Sease, appeals from the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2) and 53a-48.[1] On appeal, the defendant claims that the court abused its discretion by admitting into evidence statements made by his coconspirator to a third party. The state claims that this evidentiary claim is not reviewable as the defendant failed to preserve it at trial. We agree that the claim was not preserved for appellate review and therefore affirm the judgment of the trial court.

The jury could have found the following facts beyond a reasonable doubt. On October 2, 2009, the defendant and his coconspirator, Quan Morgan (Quan),[2] talked about committing a robbery. Quan talked about "getting some guy." The defendant stated that he also "wanted to get at that" guy "for the longest" time. That same day, the defendant told his friend, Kevin Prude, that he was going to a club on Main Street in Hartford.

Later, the defendant and Quan met at the home of Quan's mother, Shirley Williams, who lived on Westland Street in Hartford. At approximately 2:30 a.m. on October 3, 2009, the defendant and Quan left the Williams' residence on foot under the guise of getting food for Courtney Morgan, who was Quan's sister and the defendant's girlfriend. They, however, walked toward Club Vibz on Main Street. The defendant was carrying a .38 caliber semiautomatic handgun, and he gave Quan a .38 caliber revolver.

Club Vibz had closed for the night. The victim, Edward Haslam, was sitting in the operator's seat of a motor vehicle in the club's parking lot talking to Erika Taylor, who was in the passenger's seat. Dana Middleton was standing outside the vehicle on the passenger's side. Rhonda McNickles, Tarsha Zenit, and Timothy Rush were seated in McNickles' vehicle nearby.

As the two men approached the Club Vibz parking lot, the defendant stated to Quan, "that has to be him," and asked Quan if he "ha[d] his back." When they reached the parking lot of Club Vibz, Quan walked up to Middleton and, at gunpoint, demanded his cell phone and money. Quan took the cell phone and money, ordered Middleton to get on the ground, and walked away. The defendant walked to the victim's vehicle, pointed his gun in the window, stated "empty your fucking pockets," and fired one shot into the victim's chest.[3] He took the victim's money and his cell phone. As a result of having been shot, the victim bled to death. Rush saw that both men had guns.

The defendant and Quan ran toward Westland Street.

Along the way, the defendant took Quan's gun from him and hid it in the basement of a friend's home. When they arrived at the Williams residence, Quan asked the defendant why he had shot the victim. The defendant stated: "I had to. It was my reason. I got my reasons. I had to do it because something went wrong between us." While the defendant was in the Williams residence, he dropped a gun on the floor, which made a loud noise heard by Courtney Morgan and Williams. The defendant gave Courtney Morgan a cell phone to hold and called Prude to pick him up because "it was hot outside," which meant that some incident had just happened. Prude took the defendant to the home of Prude's sister.

Williams gave a statement to the police on May 21, 2010, regarding the defendant's and Quan's being in her home on October 3, 2009. Williams had had no contact with the defendant after the night in question. After she gave a statement to the police, however, the defendant drove by her home while she was sitting on the porch. As he drove by, the defendant blew his vehicle's horn, pointed his fingers as if they were a gun at Williams, and shook his head. The jury also heard evidence that, while he was incarcerated awaiting trial, the defendant discussed the robbery and shooting with Michael Lee.

At the conclusion of evidence on June 6, 2011, counsel for the defendant made a motion for a judgment of acquittal and a motion to dismiss the charges on the basis of insufficient evidence. The court denied both motions. Prior to sentencing, the defendant filed a motion to set aside the verdict and a motion to dismiss the charges on the basis of insufficient evidence. Those motions, too, were denied. Thereafter, the defendant appealed. Additional facts will be addressed as needed.

On appeal, the defendant claims that the court abused its discretion by permitting Lee to testify as to statements made by Quan. At trial, Lee testified that he was a sentenced prisoner at MacDougall-Walker Correctional Institution and that, in the past, he had been convicted of a number of felonies. He testified that no promises had been made to him in exchange for his testimony. Lee is Quan's cousin and knew of the defendant from outside of prison. He got to know the defendant because he was housed in the cell next to his. Lee reached out to law enforcement because the defendant had told him about a situation in which the defendant had "put work in." The conversation between the defendant and Lee took place in the mess hall of the prison. Lee identified the defendant at trial and testified on direct examination, in part, as follows:

"[The Prosecutor]: How did the conversation go about this case?

"[The Witness]: He asked me did I know Quan, and I said what Quan and he was like Quan Morgan. And I said, yeah, that's my cousin, and he was like—he was

like, well while we was walking to the table, he was like your cousin crazy. I was like why my cousin crazy? He was like—I guess the day that had took place they was at my aunt house—

"[The Prosecutor]: You can only say what he told you about this incident.

"[The Witness]: Yeah, that's what I'm sayin'.

"[The Prosecutor]: Okay.

"[The Witness]: He was like—they started talking about it when they was at his aunt house, I guess Quan or somethin' like that and—which is on Enfield Street. And he said Quan started talking about some dude.

"[Defense Counsel]: Objection, Your Honor. I believe he's testifying about a conversation between the defendant and Quan.

* * *

"The Court: Counsel, if you could clarify who is doing the discussion.

"[The Prosecutor]: And this is [the defendant] providing you with this information?

"[The Witness]: Yes.

"[The Prosecutor]: And is he telling you about a conversation that he's having with Quan?

"[The Witness]: Yes.

"[The Prosecutor]: About this incident?

"[The Witness]: Yes.

"[The Prosecutor]: That day?

"[The Witness]: Yes.

"The Court: Is he allowed to discuss the conversation?

"[The Prosecutor]: Yes.

"The Court: That's the question.

"[The Prosecutor]: Yes, in furtherance of the conspiracy, Your Honor.

"The Court: All right, as furtherance of the conspiracy, I'll allow it.[4]

"[The Prosecutor]: And they were talking about what was going to take place that day?

"[The Witness]: Yes.

"[The Prosecutor]: This is [the defendant] telling you this?

"[The Witness]: Yes. So he started telling me—he started telling me Quan started talking about some— getting some guy, and he was like what guy. And I guess—I guess Quan said—

"[The Prosecutor]: You can't say I guess. You can only say what [the defendant] told you.

"[The Witness]: Well, he said Quan—well, he said Quan said—

"[Defense Counsel]: Objection, Your Honor. It's hearsay what Quan said; Quan didn't testify to it in this case at all.

"The Court: Counsel, your response to the hearsay objection.

"[The Prosecutor]: Is he saying what Quan is saying—

"[The Witness]: Yeah, [the defendant] said—

"[The Prosecutor]: About what's going to happen later that night?

"[The Witness]: Yeah.

"[The Prosecutor]: It's a statement of coconspirator in furtherance of the conspiracy, Your Honor.

"The Court: I'll allow it, counsel.[5]

"[The Witness]: So, he said Quan said the guy name. He was like, oh, yeah, yeah—he was like, oh yeah, I wanted to get at that—I don't know, I can't say the N-word in here, huh?

"[The Prosecutor]: Did he swear?

"[The Witness]: Yeah.

"[The Prosecutor]: You can swear, if that's what he said.

"[The Witness]: Oh, okay. He was like—

"The Court: But, if you're not comfortable saying it, you don't have to say it.

"[The Witness]: He was, like, I wanted to get—get at that nigger for the longest and—

"[The Prosecutor]: Who said that?

"[The Witness]: That's—that's what [the defendant] said. And after that he said Quan left for like fifteen—fifteen to twenty minutes, and then went to his house and came back, and they met up, and that's when he started walking away from the table. When he walked away from the table—before he walked away from the table to get on the phone, he was like, yeah, that was my work. That's what [the defendant] said, that was my work.

"[The Prosecutor]: I'm sorry. You're saying he walked away from a table?

"[The Witness]: Before he walked away—

"[The Prosecutor]: Is this the conversation he's having with you?

"[The Witness]: Yeah.

"The Prosecutor: So before he walked away from the table—

"[The Witness]: [The defendant] said, that was my work.

"[The Prosecutor]: He said, that was . . . his work?

"[The Witness]: Yeah. He was like—he was like, yeah, but that dude—that was my work."[6]

On appeal, the defendant claims that the court abused its discretion by permitting Lee to testify as to Quan's statement about "getting some guy." The defendant assumes that the evidentiary import of that statement was to provide a motive for shooting the victim. The defendant argues that the state failed to lay a factual predicate that the statement was made while the conspiracy was ongoing, and, therefore, the court abused its discretion by admitting the statement. See Conn. Code Evid. § 8-3 (1) (D); *Macchio* v. *Breunig*, 125 Conn. 113, 122, 3 A.2d 670 (1939). The state argues that the claim is not reviewable because the defendant did not preserve it at trial. We agree.

"[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush." (Internal quotation marks omitted.) *State* v. *Jorge P.*, 308 Conn. 740, 753, 66 A.3d 869 (2013). "[A] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . ." (Internal quotation marks omitted.) *Council* v. *Commissioner of Correction*, 286 Conn. 477, 498, 944 A.2d 340 (2008).

"[T]he sina qua non of preservation is fair notice to the trial court." *State* v. *Jorge P.*, supra, 308 Conn. 753. An appellate court's "determination of whether a claim has been properly preserved will depend on a careful review of the record to ascertain whether the claim on appeal was articulated [in the trial court] with sufficient clarity to place the trial court on reasonable notice of that very same claim." Id., 754.

We have reviewed the entire transcript of Lee's testi-

mony and find that at no time did the defendant object to his testimony on the ground raised on appeal. Defense counsel twice objected to Lee's testimony, but he never stated specifically that he objected on the failure of the state to demonstrate that the statement attributed to Quan was made while the conspiracy was ongoing. Had the defendant expressly objected that the state had failed to lay the required factual predicate for Lee's testimony, the court would have been able to rule on the precise issue. Because the court was not provided with an opportunity to rule on the issue raised on appeal, we conclude that the defendant's evidentiary claim on appeal was not preserved for our review.[7]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant had been charged with murder in violation of General Statutes § 53a-54a, but the jury found him not guilty of that charge.

[2] Quan testified at trial. He was incarcerated on other charges and had a series of pending cases, including felony murder, robbery, and conspiracy charges related to the Club Vibz shooting at issue in the present case. Quan had a cooperation agreement with the state related to the Club Vibz charges, which could reduce his sentence from sixty years to twenty-five years in the custody of the Commissioner of Correction.

[3] Investigators determined that the bullet and its casing were fired from a .38 caliber semiautomatic handgun.

[4] "The following are not excluded by the hearsay rule, even though the declarant is available as a witness: (1) Statement by a party opponent. A statement that is being offered against a party and is . . . (D) a statement by a coconspirator of a party while the conspiracy is ongoing and in furtherance of the conspiracy . . . ." Conn. Code Evid. § 8-3 (1) (D).

[5] See footnote 4 of this opinion.

[6] On cross-examination, Lee testified in part as follows:

"[Defense Counsel]: All right. And your testimony was—is today that my client indicated when the conversation came up to this incident that it was his work?

"[The Witness]: Yes.

"[Defense Counsel]: Meaning that he was involved in it?

"[The Witness]: Yes.

"[Defense Counsel]: But he didn't—he didn't say he's responsible in so many words, did he?

* * *

"[The Witness]: No, he didn't say those words."

[7] In the alternative, the defendant seeks redress pursuant to the plain error doctrine. "[The plain error] doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. . . . [T]he plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly." (Internal quotation marks omitted.) *State* v. *Sanchez*, 308 Conn. 64, 76–77, 60 A.3d 271 (2013). The defendant has failed to demonstrate why his evidentiary claim warrants plain error reversal. We therefore decline to review his claim.