******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MICHAEL A. D'AMATO
(AC 36877)

Gruendel, Alvord and Prescott, Js.

Argued December 1, 2015—officially released March 8, 2016

(Appeal from Superior Court, judicial district of New Haven, geographical area number twenty-three, B. Fischer, J.)

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Kevin Shay*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Michael A. D'Amato, appeals from the trial court's judgment of conviction, rendered after a jury trial, of larceny in the second degree by defrauding a public community in violation of General Statutes §§ 53a-119 (6) (C)[1] and 53a-123 (a) (4),[2] and tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1).[3] On appeal, the defendant claims that the trial court (1) improperly "denie[d] [the defendant] his right to present a defense when the court prevent[ed] [a witness] from invoking his fifth amendment right in front of the jury"; (2) improperly allowed the prosecutor to state to "the jury what [the privileged witness'] testimony would have been and . . . fail[ed] to tell the jury not to draw any inference from [the witness'] absence from the trial"; and (3) "wrongly prevent[ed] impeachment of [East Haven police Sergeant Gary] DePalma, a key state's witness, who said [the privileged witness] put the money in the mailbox."[4] We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. On March 12, 2011, East Haven police Officer Dennis Spaulding arrested three suspects and seized drugs and more than $1300 in cash from their car. At the East Haven Police Department (department), Spaulding counted the money in front of his supervisor, DePalma. DePalma signed the department's evidence log and ensured that the seized money was properly recorded. According to DePalma, the money was placed in two plastic evidence bags. DePalma testified that he then watched Spaulding go into the department's evidence closet. Because of his positioning, he could not actually see Spaulding place the sealed bags in the evidence box, but he heard the evidence box open and close. The closet was located off of an evidence processing room, an area to which several officers had access. The locked closet was approximately six feet by six feet in dimension. The key for the closet was kept behind the duty supervisor's desk. Inside the closet was the evidence box, which was an old United States Post Office mailbox. Evidence was placed in a drawer at the top of the evidence box. Once the drawer was closed, the evidence dropped to the bottom of the evidence box and was retrieved by unlocking the bottom door.[5]

On March 17, 2011, five days after Spaulding seized the money, Sergeant George Kammerer, the department's evidence officer, went to retrieve evidence from the evidence box and discovered that the money was missing. Kammerer testified that he and another officer conducted a thorough search of the evidence closet, but they could not find the money. The state police were called in to investigate.

Within a few days after the money was discovered missing, East Haven police Captain Henry Butler III and East Haven police Commissioner Fred Brow tested the lock[6] on the evidence box. Butler testified that they pulled on the lower door of the evidence box, and even though it was locked, "it open[ed] a little bit, enough [that] I could stick my hand halfway in there . . . ." He also testified that he believed it would not be possible for a person to squeeze their entire hand into the evidence box nor could they reach to the bottom of the box.

There were several surveillance cameras in the department, but none had a clear shot of the evidence box. The cameras took still pictures eight seconds apart and did not record continuous video.[7] The state police reviewed footage of who entered and exited the closet during the five days from when the money was seized to when it was discovered missing. The investigation focused on the defendant, who at the time was a detective with the department.

The still shots from the surveillance cameras showed the defendant in the vicinity of the evidence closet on the morning of March 14, 2011. During that time, the closet door is seen opening and closing. The still shots do not actually show the defendant entering or exiting the closet, but they showed him leaving the area with something under his arm. Based on the still shots presented to the jury, it was not perfectly clear what the defendant was holding, but the state suggested that part of the item or items was colored red.[8] The state argued that this was the evidence bags containing the seized money. Four months after the theft was reported, the defendant was interviewed by state police. Initially, he did not recall being in the evidence closet, but after being shown still pictures he admitted that he may have been in there but could not remember exactly why. The defendant was arrested and charged with the theft of the missing money.

Prior to the trial, the state included Spaulding on its witness list, but it was informed by his counsel that he would be invoking his fifth amendment privilege against self-incrimination. The state subpoenaed Spaulding, and during the trial but outside the presence of the jury, Spaulding stated that he would invoke his fifth amendment right if he was required to testify. After the time of the alleged theft and prior to the commencement of the trial, Spaulding had been charged and convicted of federal crimes for civil rights violations and the obstruction of justice in relation to his conduct as an East Haven police officer. Spaulding's counsel informed the court that he had advised Spaulding not to testify because he intended to appeal his conviction. Defense counsel conducted a voir dire of Spaulding, asking whether he would invoke his privilege against self-incrimination if she were to cross-examine him during

the trial. Spaulding stated that he would invoke the privilege. Defense counsel did not request that Spaulding make his invocation of the privilege in the presence of the jury.

On February 3, 2014, the jury found the defendant guilty of larceny in the second degree and tampering with physical evidence. The trial court, *B. Fischer, J.*, sentenced the defendant to five years imprisonment, execution suspended after eighteen months, followed by two years of probation. This appeal followed.

I

The defendant claims on appeal that "[w]here evidence before the jury implicates another suspect as the sole perpetrator of the crime, the court denie[d] [the defendant] his right to present a defense when the court prevent[ed] the suspect from invoking his fifth amendment right in front of the jury." Specifically, the defendant claims that the trial court, sua sponte, should have required Spaulding to invoke his fifth amendment privilege in front of the jury. The defendant raises this claim for the first time on appeal and requests review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[9] We conclude that the claim fails under the third prong of *Golding*; the defendant has not demonstrated a violation of a constitutional right and deprivation of a fair trial.[10]

"It is true that '[t]he right to offer the testimony of witnesses . . . is in plain terms the right to present a defense, [and] the right to present the defendant's version of the facts . . . .' *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). While this sixth amendment right is binding upon the state through the fourteenth amendment, it is also established that 'the right to confront and to cross-examine [witnesses] is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' *Chambers* v. *Mississippi*, 410 U.S. 284, 295, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). The fifth amendment privilege against self-incrimination is one of those interests." (Footnote omitted.) *State* v. *Bryant*, 202 Conn. 676, 685, 523 A.2d 451 (1987).

Our Supreme Court has concluded that a defendant's constitutional right to present a defense does not include the absolute right to present a witness to the jury for the sole purpose of invoking his fifth amendment privilege against self-incrimination. Id., 685–87. In *Bryant*, the defendant requested to present a witness, his brother, who he claimed was the culpable party, for the precise purpose of having him invoke his fifth amendment privilege against self-incrimination in the presence of the jury. Id., 681. Relying on the majority view that such testimony would have a disproportionately prejudicial impact on the jury, the Supreme Court concluded that the trial court correctly barred the jury

from hearing the witness invoke his privilege against self-incrimination. Id., 686–87. The court stated: "Neither side has the right to benefit from inferences capable of being drawn by the jury where the privilege is invoked by the witness. . . . Reason and human experience indicate that inferences are certainly suggested by such a tactic; the danger inherent in this circumstance is that the inference or inferences drawn may have little, if any, juristic relation to the issues before the jury. More important, however, is the fact that the inference, whatever it may be, cannot be attacked effectively by cross-examination." (Citation omitted.) Id., 684.

Here, the defendant's right to present a defense was not violated. Furthermore, the defendant seeks to go a step beyond *Bryant* and require the trial court, sua sponte, to ensure that the jury hears the witness invoke his privilege against self-incrimination. We decline to deviate from the holding in *Bryant*.

Outside the presence of the jury, defense counsel was given an opportunity to question Spaulding, and she was satisfied that he would not answer any of her questions if he was called to testify before the jury.[11] The defendant did not request to have Spaulding testify before the jury, and appropriately, the court did not order Spaulding to do so. A careful review of the transcript discloses that the defendant was still able to present a defense that could have raised a reasonable doubt as to his guilt. Through the testimony of other witnesses, the defendant was able to show that Spaulding was the officer responsible for depositing the money in the evidence box, and even though his supervisor was present, no one actually saw Spaulding put the money in the evidence box. Knowing that Spaulding would invoke his fifth amendment privilege to not answer any questions, the defendant's sole purpose in calling him as a witness would have been to induce an inference of Spaulding's guilt based on the invocation. "[T]he sixth amendment right to call a witness must be considered in the light of its purpose, namely, to produce testimony for the defendant. . . . Calling a witness who will refuse to testify does not satisfy that purpose." (Citations omitted.) Id., 685.

The defendant argues that the court in *Bryant* held out the possibility that there could be a case in which the defendant should be allowed to call a witness only for the purpose of invoking the privilege against self-incrimination, but we conclude that this is not that case.[12] See id., 686. In *Bryant*, our Supreme Court put great emphasis on reviewing the third-party culpability evidence that was before the jury at the time that the defendant sought to call the witness to invoke the privilege on the witness stand. Id. In that case, the jury had heard a police detective testify that based on his investigation, "one of the Bryants, not specifically [the defendant], could be a suspect." (Internal quotation

marks omitted.) Id. The court concluded that even this statement, leaving open the possibility that the defendant's brother had committed the crime, was not enough to require the trial court to grant the defendant's request that the brother invoke his fifth amendment privilege against self-incrimination in the presence of the jury. Id., 686–87.

Assuming, arguendo, that the defendant had sought to call Spaulding to testify,[13] the third-party culpability evidence that was before the jury implicating Spaulding as the guilty party was no more fulsome than the evidence that had been presented in *Bryant*. See id. In this case, the jury reasonably could have found that Spaulding was the last person to have lawful custody of the money that went missing and no one actually saw Spaulding put the money in the evidence box. These limited facts were not enough to implicate Spaulding as potentially the culpable party. During closing argument, defense counsel raised the possibility that Spaulding did not put the money in the evidence box. She did not, however, (1) include Spaulding on her witness list, (2) move that Spaulding be required to invoke his fifth amendment privilege against self-incrimination in the presence of the jury, or (3) request that the court instruct the jury on third-party culpability. Under these circumstances, the defendant cannot establish a constitutional violation that deprived him of a fair trial, and thus his claim fails under the third prong of *Golding*.

## II

The defendant also claims that the prosecutor acted improperly by "telling the jury what Spaulding's testimony would have been," and that the court failed "to tell the jury not to draw any inference from Spaulding's absence from the trial . . . ." We disagree. The prosecutor's comments regarding Spaulding were not improper because they constituted a fair response to defense counsel's comments regarding Spaulding, and the defendant waived his right to challenge the court's failure to include a neutralizing instruction as to Spaulding's unavailability.[14]

The following additional facts are relevant to the defendant's claim. Throughout the trial, defense counsel cross-examined the state's witnesses about Spaulding's actions on the night the money was seized and whether anyone actually saw him put the money in the evidence box. In her closing argument, defense counsel raised the possibility that Spaulding was responsible for the missing money: "Are you even sure based on what you heard last week that money was even placed in the mailbox by Officer Spaulding."[15] In the state's rebuttal, the prosecutor theorized as to why it would not have made sense for Spaulding to process the money in front of his supervisor only to steal it minutes later.[16] "[Spaulding's] going to do this in front of him, and that's when [Spaulding's] going to—Do you honestly believe

that? The money was in the mailbox."

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [an impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived [the] defendant of his due process right to a fair trial. Put differently, [an impropriety is an impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 279, 96 A.3d 1199 (2014).

"To determine whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Devito*, 159 Conn. App. 560, 573, 124 A.3d 14, cert. denied, 319 Conn. 947, 125 A.3d 1012 (2015).

The prosecutor's comments regarding Spaulding were not improper because they were limited to responding to the defendant's assertion that Spaulding never deposited the money in the evidence box. The prosecutor was within his right to respond with an explanation of why he believed that the defense's theory was improbable. "A prosecutor may respond to the argument of defense counsel during rebuttal." *State* v. *Galarza*, 97 Conn. App. 444, 471, 906 A.2d 685, cert. denied, 280 Conn. 936, 909 A.2d 962 (2006). The prosecutor's comments were not framed as a hypothetical, i.e., had Spaulding testified this is what he would have said. More importantly, the prosecutor did not comment on Spaulding's absence. See *State* v. *Ayuso*, 105 Conn. App. 305, 329–30, 937 A.2d 1211, cert. denied, 286 Conn. 911, 944 A.2d 983 (2008) ("Contrary to the defendant's assertion, the prosecutor did not comment on the absence of [the witness]. Rather, the prosecutor merely was responding to the closing argument made by defense counsel."). The prosecutor's comments were not improper, and, therefore, the defendant's claim is without merit.

## III

Finally, the defendant claims that the trial court should have permitted him to impeach DePalma by questioning Kammerer as to a prior inconsistent state-

ment made by DePalma. The defendant claims: "The exclusion of this evidence violated [the defendant's] federal and state constitutional rights to confrontation, to cross-examination, and to present a defense." We disagree. The trial court did not abuse its discretion in determining that the evidence was inadmissible hearsay.

The following additional facts are relevant to the defendant's claim. During the state's presentation of evidence, DePalma testified that he was within six feet of Spaulding when he was supposedly putting the money in the evidence box. Although he did not actually see the money deposited, he testified that he heard the evidence box door open and close. During cross-examination, DePalma admitted that when the money was discovered missing, he immediately contacted Spaulding and asked him if he had actually deposited the money in the evidence box.[17] Later, during defense counsel's cross-examination of Sergeant Kammerer, the state objected on hearsay grounds to a question in regard to whether Kammerer heard DePalma questioning Spaulding at the police station when it was first discovered that the seized money was not in the evidence box.[18] At the time, defense counsel argued that Kammerer's answer should not be barred as hearsay because it would reveal for impeachment purposes, a prior inconsistent statement made by DePalma.[19] The court sustained the objection.[20]

"The legal standards governing the review of alleged violations of a criminal defendant's sixth amendment right to cross-examine witnesses are well established. The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . . Indeed, if testimony of a witness is to remain in the case as a basis for conviction, the defendant must be afforded a reasonable opportunity to reveal any infirmities that cast doubt on the reliability of that testimony." (Internal quotation marks omitted.) *State* v. *Jordan*, 305 Conn. 1, 27, 44 A.3d 794 (2012).

However, "[a] defendant is . . . bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the [federal] constitution does not require that a defendant be permitted to present every piece of evidence he wishes." (Internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 9–10, 1 A.3d 76 (2010). In analyzing the defendant's claims, we first review the trial court's evidentiary rulings. "Our standard of review for evidentiary claims is well settled. To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review

is plenary. . . . We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Citation omitted; internal quotation marks omitted.) Id., 10–11.

The defendant's constitutional rights were not violated. The defendant was able to cross-examine DePalma and specifically confront him about his initial instinct to question Spaulding when the money was first discovered missing. See footnote 20 of this opinion. We review the court's decision to deny defense counsel the opportunity to question a later witness, Kammerer, as to DePalma's out-of-court statement regarding Spaulding under the abuse of discretion standard.[21] See *State* v. *Winot*, 294 Conn. 753, 776, 988 A.2d 188 (2010). "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Martinez*, 295 Conn. 758, 769–70, 991 A.2d 1086 (2010). Section 6-10 of the Connecticut Code of Evidence, regarding prior inconsistent statements of witnesses, was not applicable because the defendant did not offer the court a statement that was, in fact, inconsistent with DePalma's prior testimony.[22]

Defense counsel asked DePalma, if when he first learned that the money was missing, did he question Spaulding as to whether he had actually deposited the money in the evidence box. DePalma responded: "I don't recall, but it's very possible." After refreshing his memory with a transcript of his recorded interview with the state police, DePalma testified, "correct." Later, defense counsel cross-examined Kammerer, and asked the same question—did DePalma question Spaulding about whether he deposited the money in the evidence box. Kammerer was not allowed to answer, but the defendant claims in his appellate brief that Kammerer would have answered, "yes." Thus, the answer that defense counsel insists should have been heard by the jury, would not have been inconsistent as compared with DePalma's testimony regarding what he said to Spaulding. Moreover, the record reveals that the defendant produced no evidence to show that DePalma ever disavowed that he questioned Spaulding. "Impeachment of a witness by the use of a prior inconsistent statement is proper only if the two statements are in fact inconsistent. . . . [T]he purpose of such evidence is to induce the tribunal to discard the one statement because the witness has also made another statement which cannot at the same time be true . . . ." (Internal quotation marks omitted.) *State* v. *Luther*, 152 Conn. App. 682, 693, 99 A.3d 1242, cert. denied, 314 Conn. 940, 108 A.3d 1123 (2014).

The defendant argues that the inconsistency rested within DePalma's testimony that he trusted that Spaulding had deposited the money in the evidence box, yet he questioned him the moment he learned that the money was missing. "In deciding whether the statement is admissible, the trial court must review it in light of the witness' entire testimony to determine whether it is, in fact, inconsistent with that testimony . . . and, if so, whether such inconsistency is substantial and relate[s] to a material matter. . . . Such a determination as to inconsistency lies within the discretionary authority of the trial court." (Citations omitted; internal quotation marks omitted.) *State* v. *Christian*, 267 Conn. 710, 756, 841 A.2d 1158 (2004). DePalma testified that he "trusted" Spaulding and that he heard the evidence box open and close when Spaulding was allegedly depositing the evidence, but he also testified that he did not actually view the money being put in the evidence box. The fact that DePalma later questioned Spaulding as to whether he had deposited the money was not inconsistent with his testimony at trial, and DePalma consistently admitted that he had questioned Spaulding. The trial court did not abuse its discretion by barring the defendant from eliciting hearsay testimony from Sergeant Kammerer.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-119 (6) (C) provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to . . . [d]efrauding of public community. A person is guilty of defrauding a public community who . . . as an officer or agent of any public community, with intent to prejudice it, appropriates its property to the use of any person or draws any order upon its treasury or presents or aids in procuring to be allowed any fraudulent claim against such community . . . ."

[2] General Statutes § 53a-123 (a) (4) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny, as defined in section 53a-119, and . . . the property is obtained by defrauding a public community, and the value of such property is two thousand dollars or less . . . ."

[3] General Statutes § 53a-155 (a) (1) provides in relevant part: "A person is guilty of tampering with or fabricating physical evidence if, believing that a criminal investigation conducted by a law enforcement agency or an official proceeding is pending, or about to be instituted, such person . . . [a]lters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such criminal investigation or official proceeding . . . ."

[4] The defendant asserts that his first and third claims were violations of his constitutional rights under both the United States and the Connecticut constitutions. "[T]he defendant has not provided this court with a separate analysis of his rights under the Connecticut constitution or asserted that the Connecticut constitution affords him greater protections, for purposes of his claim, than its federal counterpart. Accordingly, for purposes of this appeal we treat the jury trial rights arising from the state and federal constitutions as coextensive." (Internal quotation marks omitted.) *State* v. *Scott*, 158 Conn. App. 809, 814 n.4, 121 A.3d 742, cert. denied, 319 Conn. 946, A.3d (2015).

[5] During the trial, retired East Haven police Captain Henry Butler III testified as to how the evidence box worked: "It just was a regular U.S. mailbox, you open the drawer like you're going to mail a letter, put it in,

the stuff goes down in. The evidence officer who had the key [to] the padlock and a chain . . . would open that bottom drawer, collect the stuff up into a little plastic bin, bring it down into the main evidence room, which was down in the basement at the police department, and that was all secured."

[6] During his testimony, Butler admitted that he was not certain if the lock and chain on the evidence box had been changed before he and Commissioner Brow attempted to open the evidence box. Kammerer testified that he changed the lock after the money was reported missing, but he could not specify an exact date.

[7] State police Sergeant William Bundy explained to the jury how he utilized the still shots: "The video that was provided was of various screen shots . . . or two camera angles, rather, and they're on an eight second delay. . . . [C]amera 9 depicts the angle that goes down the hallway leading towards the detective division. Camera 8 is the angle that would show through the door . . . which leads into the hallway, which will give you, when that door is open, a view of the evidence door—evidence room door." Bundy stated that he synchronized the still shots from the two cameras to observe who accessed the evidence closet during the period of time when the money went missing; he could not make that determination from one camera angle alone. There were also several hours of camera footage where the door to the evidence closet could not be seen because another door leading to the area was closed, obscuring the view of one of the cameras. Bundy provided an example of the limitations of the camera system: "[Y]ou're looking at one moment in time. At that particular moment and utilizing one of the [camera angles the prosecutor] showed earlier at 10:06 you're just seeing what's occurring at 10:06, you don't know what happened 8 seconds prior and what was captured 8 seconds afterwards, on that particular camera, in addition to the other camera." Because of the eight second delay, Bundy relied on shadows, the direction of motion, and the changing position of a door to determine who was where in relation to the evidence closet. "So, what I was able to do was to, again, track motion, track movement, and once the door in camera 8 is in the open position . . . you would be able to see through camera 8, like in this particular case [the defendant is] standing in the window, with this door open you'd be able to see him move from one screen, the next—the next screen will show him in this particular area with the door open standing near the evidence doorway. . . . I utilized markers, if you would, like there's the doorknob which goes in there. This particular door, the angle will either increase or decrease depending on whether or not this door is open." After reviewing the video, Bundy was able to tell when the door to the evidence closet was open or closed. Bundy used the video to infer that the defendant had entered the evidence room: "What I'm saying is that the evidence door was open and [the defendant] is not in—in eyesight."

[8] During the trial, Captain Butler provided testimony describing the standard evidence bag used by the department: "East Haven Police evidence bags are clear plastic bags of different sizes depending on what evidence that you wanted to put in there. We have large, medium, small. They have a red sticky glue that once you put the evidence in it there's lines on there, you write the case number, you write the description of the item and then you seal it with the red sticky glue and you have to almost virtually cut the bag to get that—to get that apart, that doesn't come apart once you seal it."

[9] Under *Golding* review, as modified in *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, 781 (modifying third prong of *Golding*).

[10] "It is not necessary to review all of the prongs of *Golding* as [i]n the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Internal quotation marks omitted.) *State* v. *Jose V.*, 157 Conn. App. 393, 402, 116 A.3d 833, cert. denied, 317 Conn. 916, 117 A.3d 854 (2015).

[11] The following colloquy occurred:

"[Defense Counsel]: Mr. Spaulding, if I were to question you in this matter

is it my understanding that you would invoke your fifth amendment privilege?

"[The Witness]: Yes it is.

"[Defense Counsel]: Okay. I'm satisfied, Your Honor.

"The Court: All right. And the court is too. So, Mr. Spaulding, you would not answer any questions from the state of Connecticut based on the concerns that [your counsel] put on the record concerning your other case that is on appeal as I understand it, and also you would not answer any questions on cross-examination for the same reasons from [defense counsel]. Is that correct, Mr. Spaulding?

"[The Witness]: Yes, it is Your Honor."

[12] In *Bryant*, the Supreme Court stated: "While we can imagine a case in which a defendant's constitutional right to call witnesses on his behalf might arguably require that a witness who refuses to testify be called, this is not such a case." *State* v. *Bryant*, supra, 202 Conn. 686.

[13] Defense counsel did not include Spaulding on the list of witnesses that was submitted to the court prior to the start of trial.

[14] The defendant waived his claim that the court committed error by not sua sponte including a neutralizing instruction concerning the unavailability of Spaulding. See *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011) ("We conclude that, when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal. Such a determination by the reviewing court must be based on a close examination of the record and the particular facts and circumstances of each case."). The court provided the defendant a draft of the jury charge on January 30, 2014, four days before the charge was read to the jury. The state and the defendant were each given the opportunity to suggest changes to the charge, each side proposed changes that were accepted by the court, and the charge was recirculated to the parties. Defense counsel took exception with the charge only to the extent that the court's charge differed from her proposed charge in regard to presumption of innocence terminology. The defendant did not propose a neutralizing instruction concerning Spaulding. We conclude that the defendant implicitly waived his right to challenge the court's noninclusion of a neutralizing instruction, and, therefore, his claim is not entitled to *Golding* review.

[15] Defense counsel's entire remarks were as follows: "Are you even sure based on what you heard last week that money was even placed in the mailbox by Officer Spaulding. What evidence did the state prove or offer in that respect. Now, it's not an element of the crime but it's certainly something you would have to find that the evidence was in the mailbox in order for someone to steal it. What—what do you have to show that the evidence went into that mailbox? You have the spotty, contradictory and plausible testimony of Gary DePalma, who amazingly could remember the exact order the evidence bags were in, three years earlier, seven—seven evidence bags. He remembers exactly what order they were in, you know, three years ago. And he also testified, if you recall, it was a busy night that night, so he said he had a station house of prisoners being processed by the police, yet he has these specific memories. And you also heard officer after officer testify that the practice employed at the time was that the supervisor would sign off on the log and that . . . the officer would place the evidence in the evidence room himself and basically the supervisor would take the officer's word for it."

[16] The prosecutor's entire remarks were as follows: "So, he brings it into the police department and he wants you to believe that he brought it into the police department he would have had his sergeant count it out, there were numerous other officers. You know, even their own witness said that he saw him processing the evidence. So, he's gonna have his sergeant count out all the money, they're going to package it, he's going to show him on two occasions, the seven bags stapled together, all these bags with the money, and the tox[icology] report, and he's going to do all of that, then he's going to walk right in there in front of his sergeant and at that point he's going to say, you know what, I'm gonna steal the money. Pop, pop, pop, pop, pop, pop, of all the—the staples. I mean, you heard from evidence they were all stapled across the top. Pop, pop, pop, right in front of him. And I'm going to do this in front of him, and that's when I'm going to—Do you honestly believe that? The money was in the mailbox."

[17] The following colloquy occurred between defense counsel and DePalma:

"[Defense Counsel]: Now, isn't it true that when you found out that the evidence was missing you were upset?

"[The Witness]: Correct.

"[Defense Counsel]: And in fact, didn't you get Dennis—you got Dennis Spaulding's phone log? Did you—Didn't you contact Dennis Spaulding?

"[The Witness]: Yes.

"[Defense Counsel]: And isn't it true that you were talking to him over the radio?

"[The Witness]: Over the phone.

"[Defense Counsel]: Over the phone. And—And did you direct him to call you, correct?

"[The Witness]: Yes.

"[Defense Counsel]: And at some point did you say [to Officer Spaulding], call me immediately?

"[The Witness]: Correct.

"[Defense Counsel]: And did you, in fact, ask him, what did you do?

"[The Witness]: Correct.

"[Defense Counsel]: And did you, in fact, ask him, did you forget the money?

"[The Witness]: I don't recall, but it's very possible."

Defense Counsel provided DePalma with a transcript of a recorded interview between himself and state police Sergeant William Bundy. After DePalma reviewed the transcript, defense counsel resumed her questioning.

"[Defense Counsel]: Does that refresh your recollection as to whether when you spoke to Dennis Spaulding at the time that you discovered the evidence missing, that you in fact asked him, did you forget the money?

"[The Witness]: Correct."

[18] The following colloquy occurred:

"[Defense Counsel]: Is it true that you were present when Officer Spaulding was at the station and being confronted by Sergeant DePalma?

"[The Witness]: Yes.

"[Defense Counsel]: And isn't it true that Sergeant DePalma was irate?

"[The Witness]: Yes.

"[Defense Counsel]: And was he yelling at Dennis Spaulding?

"[The Prosecutor]: Objection.

"The Court: Your objection, what?

"[The Prosecutor]: Well, how does he know what was in the mind of this other individual?

"The Court: No, I'm going to sustain the objection. It's hearsay.

"[Defense Counsel]: I'm—I'm going to ask what—I'm just asking what Sergeant DePalma's demeanor was.

"The Court: Demeanor—Demeanor is fine.

"[Defense Counsel]: What was Sergeant DePalma's demeanor towards Dennis Spaulding?

"[The Witness]: Well, he was upset about the situation.

"[Defense Counsel]: Okay. And was Sergeant DePalma questioning Dennis Spaulding—

"[The Prosecutor]: Objection.

"The Court: Well, hold on. Let her finish the question.

"[Defense Counsel]: Was Sergeant DePalma questioning whether or not Officer Spaulding actually placed the evidence into the mailbox?

"[The Prosecutor]: Objection, that's hearsay.

"The Court: Right.

"[Defense Counsel]: I think it goes—

"The Court: I'm going to sustain it, it's hearsay what—

"[Defense Counsel]: Well, it's an inconsistent statement from—I'm offering it because Sergeant DePalma testified that Officer Spaulding placed the evidence into the mailbox essentially, that was the inference he wanted the jury to make and here we have Sergeant DePalma yelling at Officer Spaulding—

"[The Prosecutor]: Objection to the characterization of it, it's not—

"The Court: No. I'm going to sustain the objection. It's hearsay. I'm going to strike the question. Go ahead."

[19] On appeal, the defendant additionally claims that the witness should have been allowed to answer defense counsel's question because he would have provided evidence that would impeach DePalma by showing his bias in favor of Spaulding. This claim was not raised at trial. "[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted . . . ." (Internal quotation marks omitted.) *State* v. *Sease*, 147 Conn. App. 805, 813–14, 83 A.3d 1206, cert. denied, 311 Conn. 932, 87 A.3d 581 (2014). "We have consistently refused to consider evidentiary rulings not properly preserved. Where the issue raised for the first time on appeal is a matter of state evidentiary law, rather than of constitutional significance, this court will deny the defendant appellate review." (Internal quotation marks omitted.) *State* v. *Romero*, 59 Conn. App. 469, 477, 757 A.2d 643, cert. denied, 255 Conn. 919, 763 A.2d 1043 (2000).

[20] The defendant also claimed that the court excluded evidence of DePalma's demeanor when he confronted Spaulding over the missing money. This assertion is not supported by the trial record. The state objected to defense

counsel's question, asking Kammerer to describe DePalma's demeanor, but the court overruled the objection, and Kammerer testified as to his observations. See footnote 18 of this opinion.

[21] Section 8-1 (3) of the Connecticut Code of Evidence defines hearsay as: "a statement, other than one made by the declarant while testifying at the proceeding, offered in evidence to establish the truth of the matter asserted."

[22] The record does not clearly indicate if defense counsel was attempting to introduce Kammerer's testimony as to what DePalma said on March 17, 2011, as a prior inconsistent statement for substantive purposes or for impeachment purposes. The statement would not qualify as an exception to the hearsay rule or nonhearsay under either section of the Connecticut Code of Evidence. Section 8-5 of the Connecticut Code of Evidence addresses prior inconsistent statements that are introduced for substantive purposes and provides in relevant part: "The following are not excluded by the hearsay rule, provided the declarant is available for cross-examination at trial . . . [p]rior inconsistent statement. A prior inconsistent statement of a witness, provided (A) the statement is in writing or otherwise recorded by audiotape, videotape, or some other equally reliable medium, (B) the writing or recording is duly authenticated as that of the witness, and (C) the witness has personal knowledge of the contents of the statement." DePalma's statement on March 17, 2011, could not be used for substantive purposes because it was not in writing or recorded by a reliable medium.

Section 6-10 of the Connecticut Code of Evidence addresses prior inconsistent statements of witnesses made for impeachment purposes, but applies only when the statement in question is factually inconsistent. It provides in relevant part: "The credibility of a witness may be impeached by evidence of a prior inconsistent statement made by the witness. . . . In examining a witness concerning a prior inconsistent statement, whether written or not, made by the witness, the statement should be shown to or the contents of the statement disclosed to the witness at that time. . . . If a prior inconsistent statement made by a witness is shown to or if the contents of the statement are disclosed to the witness at the time the witness testifies, and if the witness admits to making the statement, extrinsic evidence of the statement is inadmissible, except in the discretion of the court. . . ." Conn. Code Evid. § 6-10. When defense counsel confronted DePalma about his statements to Spaulding, he admitted that he had made them.

———————————————